# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JULIE BARLIA,

        Plaintiff,

                               Case No. 15-10243

v.                                  Hon. Gerald E. Rosen

MWI VETERINARY SUPPLY, INC.,

        Defendant.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on        January 24, 2017       

PRESENT:     Honorable Gerald E. Rosen
                    United States District Judge

## I. INTRODUCTION

Plaintiff Julie Barlia commenced this action in this Court on January 21, 2015, alleging that her former employer, Defendant MWI Veterinary Supply, Inc.,[1] violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* by discharging her due to her disability and retaliating against her when she requested an accommodation of this disability. This Court's subject matter

---

[1]Defendant states that the correct name of its business is MWI Veterinary Supply Co.

jurisdiction rests upon Plaintiff's assertion of claims arising under the federal ADA. *See* 28 U.S.C. § 1331.

By motion filed on April 4, 2016, Defendant now seeks an award of summary judgment in its favor on each of Plaintiff's ADA claims. In support of this motion, Defendant first contends that Plaintiff has failed as a matter of law to establish one or more elements of a *prima facie* case of disability discrimination or retaliation. Next, even assuming that Plaintiff could establish this *prima facie* case, Defendant argues that she cannot show that her employer's legitimate reasons for terminating her employment were a pretext for unlawful discrimination or retaliation.

Defendant's motion has been fully briefed by the parties. Having reviewed the briefs in support of and in opposition to Defendant's motion, as well as the accompanying exhibits and the remainder of the record, the Court finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will resolve Defendant's motion "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

**A.     The Parties**

Defendant MWI Veterinary Supply, Inc. is a distributor of animal health products.  Plaintiff Julie Barlia began her employment with Defendant on October 27, 2008 as an outside sales representative ("OSR") assigned to a sales territory in southeastern Michigan.  Throughout her employment, Plaintiff reported to Terry Walsh, Defendant's Great Lakes Regional Sales Manager, and Mr. Walsh, in turn, reported to Defendant's Vice President of Eastern Sales, Spencer Breithaupt.

**B.     Plaintiff's Job Performance**

As an OSR, Plaintiff was responsible for promoting and selling animal health products to veterinary care providers in her sales territory.  (*See* Defendant's Motion, Ex. 2, Plaintiff's Dep. at 108.)  Starting in at least 2013, and perhaps in 2012, Plaintiff was expected to achieve at least 95 percent of her sales goal each month.  (*See id.* at 106.)

In fiscal year ("FY") 2013,[2] Plaintiff's sales fell below the 95-percent target for three consecutive months — January, February, and March of 2013.  (*See* Defendant's Motion, Ex. 7, Walsh 4/1/2016 Decl. at ¶ 38; Plaintiff's Response,

---

[2]Defendant's fiscal year runs from October 1 to September 30 of the following year.  Thus, Defendant's FY 2013 spanned from October 2012 to September 2013, and FY 2014 ran from October 2013 to September 2014.

Ex. 11, FY 2013 Sales Results.)  During this three-month period, Defendant realigned its Great Lakes Region's sales territories to create a territory for a newly-hired OSR, Jeffrey Kloosterman, and some of Plaintiff's accounts were taken from her in this realignment.  (*See* Plaintiff's Dep. at 101, 103-04, 122-25; *see also* Plaintiff's Response, Ex. 13.)[3]  To account for these changes, Plaintiff's monthly and annual sales goals were reduced by five percent, and she was given a "bridge" payment to help her through this transitional period.  (*See* Plaintiff's Dep. at 125; *see also* Defendant's Motion, Ex. 6, Walsh Dep. at 54, 73-74; Ex. 8, Breithaupt Dep. at 19-21.)

Despite the adjustment to her sales goals, Plaintiff again failed to achieve her 95-percent target in April, May, June, and September of 2013, for a total of seven out of twelve months in FY 2013 below the 95-percent goal.  (*See* Walsh 4/1/2016 Decl. at ¶ 38; Plaintiff's Response, Ex. 11, FY 2013 Sales Results.)  In a fiscal year-end performance review conducted in September of 2013, Plaintiff received an average rating of 1.87 — just below the rating of 2 for meeting expectations — in the quantitative portion of her evaluation, but her average

---

[3]Plaintiff testified that her top two accounts and seven of her top 25 accounts were given to Mr. Kloosterman in this realignment.  (*See* Plaintiff's Dep. at 100.)  Although Plaintiff also was given accounts in the realignment, she recalled that only two of these accounts were doing any business with Defendant at the time.  (*See id.* at 101, 125.)

4

ratings were 2.5 and 2.4, respectively, in the areas of core values and technical skills. (*See* Defendant's Motion, Ex. 11, FY 2013 Performance Review.)

In FY 2014, Plaintiff continued to fall short of her monthly sales goals, failing to meet her 95-percent target each month from October 2013 through February 2014. (*See* Walsh 4/1/2016 Decl. at ¶ 38; Plaintiff's Response, Ex. 11, FY 2014 Sales Results.) For a two-day period in mid-December of 2013, Mr. Walsh rode along with Plaintiff on her sales calls,[4] and he then sent her a December 19, 2013 e-mail summarizing the discussion during this "ride-with." (*See* Defendant's Motion, Ex. 13, Walsh 12/19/2013 E-mail; *see also* Plaintiff's Dep. at 137-38.) In this e-mail, Mr. Walsh reminded Plaintiff of Defendant's 95-percent sales target and noted that her territory was "currently at 83% of [her] FY [20]14 goal," but he acknowledged that she was doing a "great job" with one of the product lines she was marketing and selling. (Walsh 12/19/2013 E-mail.) Mr. Walsh proposed strategies for Plaintiff to "regain [her] momentum," and stated that "[w]e will revisit your progress toward achieving your goal at the end of March, with expectations of meeting 95% of goal." (*Id.*)

---

[4]Plaintiff testified that she experienced a dizzy spell while Mr. Walsh accompanied her on her sales calls, and that Mr. Walsh assumed the driving duties for the remainder of that day. (*See* Plaintiff's Dep. at 141.) According to Plaintiff, she and Mr. Walsh had discussions over the years about adrenal and thyroid issues and hormonal imbalances, so that he was aware in December of 2013 of the symptoms that Plaintiff experienced due to these health issues. (*See id.* at 141-43.)

5

On January 29, 2014, Plaintiff sent an e-mail to Defendant's human resources director, Debby Ball, asking to be excused from attending an out-of-town national sales meeting ("NSM") that was scheduled for the following week. (*See* Defendant's Motion, Ex. 3, Plaintiff's 1/29/2014 E-mail.)  In support of this request, Plaintiff stated that she had met with her doctor "regarding some symptoms that I have been experiencing," and that her doctor had "recommend[ed] that I do not travel at this time."  (*Id.*)  Plaintiff also provided a brief note from her physician, stating that Plaintiff had "experienced symptoms consistent with thyroid and hormonal imbalance" and had "lost weight[] consistent with these issues," and asking that "she not fly in an airplane or take trips outside this geographic area" while she was still "being evaluated and treated." (Defendant's Motion, Ex. 3, 1/28/2014 Doctor's Note.)  On January 30, 2014, Ms. Ball advised Mr. Walsh that "[w]e have received a note from [Plaintiff's] medical provider indicating that she cannot currently travel outside of her sales region," and that she therefore "w[ould] not be attending the NSM."  (Defendant's Motion, Ex. 16, Ball 1/30/2014 E-mail.)[5]

---

[5]Within a month or two thereafter, Plaintiff traveled to Jamaica.  Although Plaintiff could not recall being specifically cleared to travel, she testified that her doctor "wasn't as concerned for me traveling" by that time, partly because her husband was accompanying her on the trip.  (Plaintiff's Dep. at 150.)

Plaintiff again failed to achieve her 95-percent sales target in April of 2014, meaning that she had met this goal in only one of the first seven months of FY 2014, and her overall average during this seven-month period was 86.5 percent. (*See* Walsh 4/1/2016 Decl. at ¶¶ 24, 38.)  Thus, at some point in April of 2014, Mr. Walsh spoke to Defendant's director of human resources, Ms. Ball, regarding Plaintiff's repeated failure to meet her sales goals, and he decided to implement a performance improvement plan ("PIP") for Plaintiff.  (*See id.* at ¶ 26; *see also* Defendant's Motion, Ex. 14, Ball Dep. at 25.)

On May 9, 2014, Plaintiff was advised that she was being placed on a PIP, and a copy of the plan was sent to her by e-mail.  (*See* Plaintiff's Dep. at 155-57, 210-11; *see also* Defendant's Motion, Ex. 12, Performance Improvement Plan.) The PIP stated that Plaintiff was not meeting Defendant's sales expectations or the company's expectations regarding the "frequency and quality of [her] communication" with her supervisor, Mr. Walsh.  (PIP at 1.)  The PIP then described the improvements and corrections expected from Plaintiff, including (i) that "[e]ffective immediately, [she] must maintain an average of 95% of her monthly goal for the months of May, June and July 2014," (ii) that by May 31, 2014, Plaintiff would "provide [Mr. Walsh] with a plan of action on how she will improve her sales of" a particular piece of equipment, "so that she can ensure that

7

she meets the requirement of one sale per quarter," and (iii) that "[e]ffective immediately, no later than noon each Monday, [Plaintiff] is to send [Mr. Walsh] a 'Route Activity Sheet' or call plan detailing her activities from the previous week." (*Id.* at 2.)  Finally, Plaintiff was cautioned that if she failed to meet the objectives set forth in the PIP, "additional discipline up to and including termination of employment will occur." (*Id.*)  On May 14, 2014, Plaintiff returned a signed copy of the PIP to a human resources representative, indicating that she "acknowledge[d] receipt" but "d[id] not agree this action is justified." (*Id.*)

## C.    Plaintiff's Termination in a Company-Wide Workforce Reduction

On or around May 14, 2014, Ms. Ball generated a list of Defendant's employees and their annual salaries, in order to assist a "leadership team" of Defendant's senior-level executives in "examining the impact of potential expense-reduction measures, including a potential workforce reduction." (Defendant's Motion, Ex. 15, Ball 4/3/2016 Decl. at ¶¶ 11-12; *see also* Ball Dep. at 52-53, 56, 58-59.)  Defendant's president and chief executive officer, Jim Cleary, then sent a company-wide e-mail on May 20, 2014, stating that the company's financial results for the most recent quarter fell short of expectations, and that the company thus planned to "implement significant expense-reduction measures." (Defendant's Motion, Ex. 22, Cleary 5/20/2014 E-mail.)

8

In response to this call for cost-cutting measures, Defendant's Vice President of Eastern Sales, Spencer Breithaupt, held a May 27, 2014 conference call with his regional sales managers, including Mr. Walsh, and asked each of them to identify one or two individuals in his or her region who should be considered for layoff in the event that Defendant elected to reduce its workforce. (*See* Walsh Dep. at 66-68, 75; Breithaupt Dep. at 99-102.)  Mr. Walsh selected Plaintiff as the individual to face a possible layoff, explaining that she was the only employee in his region who was currently on a PIP, that she had "struggled with her sales over the course of a year and a half," and that she had "bec[o]me disengaged from [her] position" following the realignment of her sales territory. (Walsh Dep. at 27-30.)

Mr. Breithaupt adopted this recommendation, and Plaintiff's employment was terminated on June 3, 2014.  (*See* Walsh Dep. at 73; Breithaupt Dep. at 101-02; Plaintiff's Dep. at 165.)  As stated by Mr. Cleary in a June 4, 2014 company-wide e-mail, roughly five percent of Defendant's employees were discharged in the company's workforce reduction, and Defendant also closed two of its distribution centers.  (Defendant's Motion, Ex. 22, Cleary 6/4/2014 E-mail; *see also* Ball 4/3/2016 Decl. at ¶ 15 (estimating that Defendant's workforce was reduced by approximately four percent).)  According to Mr. Walsh, Plaintiff was

9

not replaced and her former position was not posted following her termination. (*See* Walsh 4/1/2016 Decl. at ¶ 43.)  Instead, an inside sales representative handled the orders placed by phone from within Plaintiff's sales territory, and a "specialty sales representative, who covers multiple states, has visited [Plaintiff's] former customers, as necessary."  (*Id.*)

## III.  ANALYSIS

### A.    The Standards Governing Defendant's Motion

Through the present motion, Defendant seeks an award of summary judgment in its favor on Plaintiff's federal ADA claims of disability discrimination and retaliation.  Under the pertinent Federal Rule, summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the

evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.      Plaintiff Has Failed to Establish a *Prima Facie* Case of Disability Discrimination Under the ADA, Nor Has She Shown that Defendant's Stated Reason for Her Discharge Is a Pretext for Unlawful Discrimination.**

In Count I of her complaint, Plaintiff alleges that Defendant discriminated against her and terminated her employment "on the basis of [her] disability," in violation of 42 U.S.C. § 12112(a). In the absence of direct evidence of disability

11

discrimination,[6] this claim is governed by the familiar tripartite analytical framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). *See Ferrari v. Ford Motor Co.,* 826 F.3d 885, 891 (6th Cir. 2016). To establish a *prima facie* case at the first stage of this analysis, a plaintiff ordinarily must show (i) that she had a disability within the meaning of the ADA, (ii) that she was otherwise qualified to perform the job she held prior to her discharge, with or without reasonable accommodation, (iii) that she suffered an adverse employment decision, (iv) that the defendant employer knew or had reason to know of her disability, and (v) that she was replaced or her former position remained open while the employer sought other applicants. *See Ferrari,* 826 F.3d at 891-92; *Whitfield v. Tennessee,* 639 F.3d 253, 259 (6th Cir. 2011).

Where, as here, a plaintiff is discharged as part of a workforce reduction, the Sixth Circuit has determined that the fifth and final element of the *prima facie* case must be altered because the plaintiff "is not replaced." *Arthur v. American Showa, Inc.,* No. 14-4145, 625 F. App'x 704, 707 (6th Cir. Aug. 14, 2015). "Instead, the plaintiff must introduce additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Arthur,* 625 F. App'x at 707 (internal quotation marks

---

[6]Plaintiff does not claim to have produced any such direct evidence here.

and citations omitted); *see also Geiger v. Tower Automotive,* 579 F.3d 614, 623 (6th Cir. 2009).  A plaintiff may establish this element of her *prima facie* case by "demonstrat[ing] that a comparable non-protected person was treated better." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 350 (6th Cir. 1998) (internal quotation marks and citation omitted).

Once Plaintiff has established a *prima facie* case of disability discrimination, Defendant bears the burden of offering a legitimate, non-discriminatory explanation for its adverse employment decision.  *See Ferrari,* 826 F.3d at 892.  If it does so, Plaintiff then must show that Defendant's proffered explanation is a pretext for unlawful discrimination.  826 F.3d at 892.

## 1. Plaintiff Has Not Shown that She Was Disabled Within the Meaning of the ADA.

In its present motion, Defendant challenges Plaintiff's showing as to several elements of her *prima facie* case, arguing (i) that Plaintiff's condition does not meet the ADA's definition of a "disability," (ii) that it was not aware of her purported disability, (iii) that Plaintiff was not otherwise qualified for her former position, and (iv) that Plaintiff has failed to produce evidence indicating that she was singled out for discharge for impermissible reasons.  The Court agrees as to the first of these contentions, and therefore need not address the remaining elements of Plaintiff's *prima facie* case.

13

As pertinent to this case, the ADA defines a "disability" as (i) "a physical or mental impairment that substantially limits one or more major life activities of [an] individual," or (ii) "being regarded as having such an impairment."  42 U.S.C. § 12102(1)(A), (C).[7]  This definition was left unchanged by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, but this enactment supplied a number of "[r]ules of construction" that, among other things, dictate that the statutory definition of disability "shall be construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of" the statute.  42 U.S.C. § 12102(4)(A).  Moreover, while the Supreme Court had held that an impairment must have a "permanent or long term impact" in order to qualify as disabling under the ADA, *Toyota Motor Manufacturing, Inc. v. Williams,* 534 U.S. 184, 198, 122 S. Ct. 681, 691 (2002), the ADAAA overruled this aspect of the *Toyota* decision (among others), providing that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  42 U.S.C. § 12102(4)(D); *see also Spence v. Donahoe,* No. 11-3203, 515 F. App'x 561, 569 (6th Cir. Feb. 21, 2013) (recognizing that the ADAAA "expressly overruled" *Toyota'*s holding that "temporary physical

_____

[7]The ADA's definition of a "disability" also encompasses "a record of such an impairment," 42 U.S.C. § 12102(1)(B), but Plaintiff does not seek to invoke this prong of the statutory definition in this case.

14

conditions do not generally constitute substantial impairments").

In her complaint, Plaintiff alleges that at the time of the events giving rise to this case, she suffered from "adrenal insufficiency, hypothyroidism, mastocytosis and histamine release syndrome." (Complaint at ¶ 35.) As evidence of these claimed impairments and their impact upon major life activities, Plaintiff cites her own deposition testimony and thirteen pages of medical records attached as an exhibit to her response to Defendant's motion. (*See* Plaintiff's Response Br. at 15-16.)[8] Upon reviewing this record, however, the Court finds that no reasonable trier of fact could conclude from this evidence that Plaintiff was "disabled" as this term is defined in the ADA.

The first portion of the medical record submitted by Plaintiff consists of a table listing the dates she visited her physician, a terse description of the "[p]roblems" that triggered each of these visits, the "[s]tatus" of these problems, and the name of her attending physician. (*See* Plaintiff's Response, Medical

_____

[8]Notably, Plaintiff does not cite to any particular portions of these medical records in support of the various factual assertions made in her response to Defendant's motion. Instead, the Court has been left to its own devices in identifying evidentiary support for these assertions. *Cf.* Fed. R. Civ. P. 56(c)(1)(A) (mandating that a party "cit[e] to particular parts of materials in the record" in order to support a claim of a genuine factual dispute).

15

Records at 1-2.)[9]  Although each of these problems is characterized as "[a]ctive," nothing in the record suggests what this might mean, nor is there any indication that a physician diagnosed Plaintiff as suffering from any of the impairments identified as "problems."  In addition, the record fails to indicate who generated this table or the source of the information it contains.

Much of the remaining medical record is equally unilluminating.  One table, for instance, lists a number of dates from 2011 to 2015 that Plaintiff visited a particular medical facility and a one-word statement of the "[r]eason" for each visit.  (*Id.* at 3.)  Although the stated "reason" for several of these visits is hypothyroidism, there again is no evidence that a physician diagnosed Plaintiff as suffering from this condition, nor any indication of the source data from which this table was generated.  Similarly, while Plaintiff has produced two-page summaries of two visits to her physician, (*see id.* at 4-7),[10] there is no indication that the conditions identified in the "Problem Lists" for these visits reflect actual diagnoses by a medical professional, as opposed to, say, patient complaints or

---

[9]This table indicates, for example, that Plaintiff saw her physician in August of 2012 and February of 2013 in connection with adrenal insufficiency and a hypothyroid issue.

[10]The copies produced for the Court's review are of poor quality, and it is difficult to discern the dates of these two visits.  Indeed, it is not even clear that these materials reflect two separate office visits.

16

potential concerns that required further investigation. In fact, the "notes" portion of these summaries state that there is "[n]o evidence of adrenal insufficiency," (*see id.* at 5, 6), and the remainder of the notes are not sufficiently self-explanatory to reflect a diagnosis of any of the conditions identified in Plaintiff's complaint.

The next document in Plaintiff's "medical records" is the brief January 28, 2014 note submitted by Plaintiff's physician in support of her request that she be excused from attending the February 2014 national sales meeting. (*See id.* at 8.) As observed earlier, this note does not disclose any diagnosis of a medical condition, but instead states that Plaintiff had "experienced symptoms consistent with thyroid and hormonal imbalance," and that she also had "lost weight, consistent with these issues." (*Id.*) Accordingly, Plaintiff's physician recommended that she "not fly in an airplane or take any trips outside this geographic area" while she was being "evaluated and treated." (*Id.*)

The final few pages of the "medical records" submitted by Plaintiff concern a leave of absence she requested in July of 2010. (*See id.* at 9-13.) In support of this request, Plaintiff's physician completed a form stating (i) that Plaintiff had "present[ed] [with] extreme fatigue, peripheral neuropathy, thyroid disorder and decreased mental clarity," (ii) that she was being given treatment "aimed at rebalancing thyroid and adrenal glands and addressing nutritional deficiencies to

17

improve cognitive functioning and address physical symptoms," (iii) that this condition began in September of 2009 and was expected to last approximately six months to a year, and (iv) that Plaintiff would be unable to perform at least some of her job duties due to "[f]atigue and decreased mental clarity."  (*Id.* at 11.) Plaintiff's physician further opined that her condition could "maybe" involve episodic flare-ups with symptoms that would "prevent her ability to perform job duties," but that "[i]deally" Plaintiff would "not have flare ups once [her] treatment begins."  (*Id.* at 12.)

In a decision that post-dates the ADAAA and its more expansive rules of construction, the Sixth Circuit recently held that a plaintiff's "bare assertions" regarding a health condition or concern, "without any supporting medical evidence, cannot establish a 'physical or mental impairment' within the meaning of the ADA."  *Neely v. Benchmark Family Services,* No. 15-3550, 640 F. App'x 429, 433 (6th Cir. Jan. 26, 2016); *see also Felkins v. City of Lakewood,* 774 F.3d 647, 652-53 (10th Cir. 2014); *Cadwell v. Henry Ford Health System,* No. 14-13887, 2016 WL 5369608, at *7 n.7 (E.D. Mich. Sept. 26, 2016).  While Plaintiff maintains that her "medical records show that she suffers from thyroid and adrenal insufficiencies," (Plaintiff's Response Br. at 15), a survey of these records fails to disclose a medical professional's diagnosis of any such condition, much less any

18

medical findings that would substantiate or support any such diagnosis. Instead, these records identify only "problems" that evidently led Plaintiff to visit her physician, with no indication that these health concerns were confirmed (or even investigated) through examination or medical tests. Indeed, Plaintiff's bare-bones submissions do not even disclose the underlying sources of the information they contain, so it is highly debatable whether this information could be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

To be sure, Plaintiff's medical records include a physician's statement in support of her July 2010 request for medical leave, and Plaintiff's physician indicated in this statement that Plaintiff "maybe" could suffer from episodic flare-ups of her condition that would prevent her from performing the duties of her job. (*See* Medical Records at 12.) As observed earlier, the ADA as amended by the ADAAA provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active," 42 U.S.C. § 12102(4)(D), and Plaintiff suggests that this July 2010 physician's statement supports the conclusion that her "conditions were flaring in January 2014 when [she] requested the accommodation to be excused from the mandatory National Sales Meeting," (Plaintiff's Response Br. at 16.) Yet, nothing in the medical record forges the requisite link between the conditions identified in the

July 2010 physician's statement and the "symptoms," (Medical Records at 8) — as opposed to a diagnosed medical condition — that led Plaintiff's physician to recommend that she not travel to the February 2014 national sales meeting. *See Deister v. Auto Club Insurance Ass'n,* No. 15-1620, 647 F. App'x 652, 655 n.1 (6th Cir. May 11, 2016) (observing that a past diagnosis of an "episodic" condition does not establish a "disability" under the ADA absent evidence that this condition "resulted in substantial limitation of [the plaintiff's] major life activities" at the time of the challenged adverse employment decision). Rather, it is a matter of pure speculation whether the health concerns reported by Plaintiff to her physician in 2013 and 2014 could be said to be "flare-ups" of the condition identified in the July 2010 physician's statement. Consequently, the Court finds that Plaintiff has failed as a matter of law to establish a "physical or mental impairment" within the meaning of the ADA.

Even assuming that the medical records produced by Plaintiff were sufficient to establish one or more of the physical impairments alleged in her complaint, the Court agrees with Defendant that Plaintiff has not shown that these impairments substantially limited one or more of her major life activities. In an effort to make this showing, Plaintiff first suggests, without any citation to the record, that her "thyroid and adrenal deficiencies, when flaring, significantly

20

limited her endocrine functions as well as her ability to perform daily activities."
(Plaintiff's Response Br. at 15 (footnote omitted).)  Yet, the medical record is
devoid of evidence, such as test results or a physician's findings, that would
substantiate Plaintiff's claim of limited endocrine function, much less demonstrate
that this was a "substantial" limitation.  Moreover, to the extent that Plaintiff
characterizes her health concerns in 2013 and 2014 as "flare-ups" of a condition
that, according to her physician, left her unable in July of 2010 to perform the
duties of her job and caused her "extreme fatigue" and "decreased mental clarity,"
(Medical Records at 11), the Court already has explained that Plaintiff's claim of
"flare-ups" of an ongoing, episodic medical condition lacks support in the
evidentiary record.

This leaves only Plaintiff's own testimony that her medical conditions
caused weight loss and dizziness and affected her endurance, energy level, job
performance, and "every aspect of [her] life," at least to some degree.  (Plaintiff's
Dep. at 179-82.)  As Defendant correctly observes, Plaintiff's cursory reference to
this testimony in her response to Defendant's motion falls well short of a properly
supported argument that her alleged impairments "substantially limit[ed] one or
more major life activities," as required to establish a disability under the ADA.
Moreover, the Sixth Circuit has repeatedly recognized that a plaintiff's "self-

21

described symptoms," standing alone, "are insufficient to establish a substantial limitation on a major life activity." *Neely,* 640 F. App'x at 435; *see also Simpson v. Vanderbilt University,* No. 08-6548, 359 F. App'x 562, 567 (6th Cir. Dec. 22, 2009); *McNeill v. Wayne County,* No. 07-2325, 300 F. App'x 358, 361-62 (6th Cir. Nov. 6, 2008). Accordingly, Plaintiff has failed as a matter of law to establish that in the time period of relevance here, she suffered from a physical or mental impairment that substantially limited one or more of her major life activities.

Finally, Plaintiff suggests that she can satisfy the first prong of a *prima facie* case of disability discrimination through evidence that Defendant "regarded" her as disabled. *See* 42 U.S.C. § 12102(1)(C). This contention, however, is relegated to a two-sentence footnote, without citation to the record or supporting authority. (*See* Plaintiff's Response Br. at 14 n.10.) "It is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argument, are deemed waived," *Dillery v. City of Sandusky,* 398 F.3d 562, 569 (6th Cir. 2005) (internal quotation marks and citations omitted).

In any event, Plaintiff's suggested grounds for concluding that Defendant regarded her as disabled do not pass muster under the pertinent case law. First, while she contends that her supervisor, Mr. Walsh, regarded her as disabled "after he witnessed her suffer from extreme dizziness" as he accompanied Plaintiff on

22

her sales calls in December of 2013, (*see* Plaintiff's Response Br. at 14 n.10), the Sixth Circuit has held that evidence that a plaintiff's supervisors and co-workers observed symptoms of an alleged impairment does not suffice to satisfy the "regarded as" prong of the ADA's definition of disability. *See Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1106 (6th Cir. 2008); *see also Neely,* 640 F. App'x at 436. Rather, Plaintiff must produce evidence of Defendant's belief that she was incapable of performing the functions of her job, *see Talley,* 542 F.3d at 1106, and she has not done so. Similarly, to the extent that Plaintiff maintains that Defendant regarded her as disabled when it granted her request to be excused from attending a national sales meeting in February of 2014, this episode would suggest, at most, Defendant's belief that Plaintiff was unable to perform a specific aspect of her particular job,[11] and this falls well short of evidencing a belief that Plaintiff was substantially limited in the major life activity of working. *See Ferrari,* 826 F.3d at 893-94; *Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 704 (6th Cir. 2008). Accordingly, the "regarded as" prong of the statutory definition of disability does not assist Plaintiff in her effort to establish a *prima facie* case of disability discrimination.

---

[11]Notably, Plaintiff testified that although she did not travel to the national sales meeting, she continued to work and call on customers during the days of this meeting. (*See* Plaintiff's Dep. at 150.)

23

**2.     Even Assuming That Plaintiff Could Establish a *Prima Facie*
     Case of Disability Discrimination, She Has Failed to Show That
     Defendant's Stated Non-Discriminatory Reason for Terminating
     Her Employment Is a Pretext for Unlawful Discrimination.**

Assuming, contrary to the foregoing analysis, that Plaintiff could establish a

*prima facie* case of disability discrimination, Defendant would then bear the

burden of articulating a legitimate, non-discriminatory explanation for its adverse

employment decision. *See Ferrari,* 826 F.3d at 892.  There is no dispute that

Defendant has satisfied this burden by pointing to (i) its June 2014 workforce

reduction, and (ii) its selection of Plaintiff for discharge as part of this workforce

reduction, where she was the only employee in her region who was subject to a

performance improvement plan ("PIP") at the time.

Accordingly, Plaintiff must show that Defendant's proffered explanation for

her discharge is a pretext for unlawful discrimination.  *See Ferrari,* 826 F.3d at

892.  This showing of pretext can be made through evidence (i) that Defendant's

proffered explanation has no basis in fact, (ii) that the reason given by Defendant

did not actually motivate Plaintiff's discharge, or (iii) the reason given by

Defendant was insufficient to motivate its discharge decision.  *See Ferrari,* 826

F.3d at 895.

In a single paragraph in her response brief, unadorned by any citation to

authority, Plaintiff suggests two grounds for deeming Defendant's explanation

pretextual, but neither is supported by evidence.  First, Plaintiff contends that her supervisor, Mr. Walsh, placed her on a PIP only *after* he learned of Defendant's impending workforce reduction, (*see* Plaintiff's Response Br. at 10, 22), presumably so that he could then cite this PIP as a basis for recommending that Plaintiff be discharged as part of this workforce reduction.  The record, however, unequivocally refutes Plaintiff's proposed chronology of the events leading up to her discharge.  Both Mr. Walsh and Defendant's human resources director, Ms. Ball, state without contradiction that they spoke in April of 2014 about placing Plaintiff on a PIP.  (*See* Walsh 4/1/2016 Decl. at ¶ 26; Ball Dep. at 25.)  By Plaintiff's own admission, this PIP then was delivered to Plaintiff by e-mail on May 9, 2014.  (*See* Plaintiff's Dep. at 155-57, 210-11; *see also* Defendant's Motion, Ex. 12 (5/9/2014 E-mail to Plaintiff with attached PIP).)  In contrast, the earliest evidence of a possible workforce reduction is Ball's testimony that on May 14, 2014 — a few days *after* Plaintiff received her PIP — she generated a list of Defendant's employees and their salaries for use by senior-level management in their examination of "potential expense-reduction measures, including a potential workforce reduction."  (Ball 4/3/2016 Decl. at ¶¶ 11-12; *see also* Ball Dep. at 52-53, 56, 58-59.)  Moreover, Mr. Walsh states without contradiction that he first learned of Defendant's planned workforce reduction on May 27, 2014, during a

25

conference call in which his supervisor, Mr. Breithaupt, asked each of Defendant's regional managers to identify an employee to consider for layoff in the event of this reduction. (*See* Walsh 4/1/2016 Decl. at ¶ 36; Walsh Dep. at 66-68, 75.) Accordingly, there is no evidentiary support for Plaintiff's theory that her PIP was developed as a means to ensure her discharge in Defendant's forthcoming workforce reduction.

Next, Plaintiff contends that Mr. Walsh placed her on a PIP even though "other OSRs in his region had inferior objective performance rankings." (Plaintiff's Response Br. at 22.) Unfortunately, Plaintiff does not elaborate on this bare assertion in her brief discussion of pretext, but instead leaves the Court to its own devices in culling the requisite argument and evidentiary support from other portions of Plaintiff's response brief. Nonetheless, it appears that the "other OSRs" alluded to in this passage are Andrew Bennett, Carrie Visser, and Jeffrey Kloosterman.

The record does not support Plaintiff's claim that these other OSRs were treated more favorably than her despite their inferior job performance. Turning first to Andrew Bennett, Plaintiff correctly observes that he fell short of his 95-percent goal in nine out of twelve months in FY 2013, versus only seven of twelve months for Plaintiff, and that his overall average of 92.9 percent for FY 2013 was

lower than Plaintiff's average of 95.94 percent.  (*See* Plaintiff's Response, Ex. 11,
FY 2013 Sales Results; Ex. 17, Sales Goal Averages for FY 2013.)  Yet, Plaintiff
neglects to mention that for the first eight months of FY 2014 prior to her
discharge, Plaintiff failed to meet her 95-percent goal in seven of these eight
months, while Mr. Bennett fell short of this goal in only three months (including
one month where he achieved 94.8 percent of his goal, just short of the 95-percent
target).  (*See* Plaintiff's Response, Ex. 11, FY 2014 Sales Results; Ex. 17, Sales
Goal Averages for FY 2014.)  Moreover, Mr. Bennett's overall average for this
eight-month period was over 100 percent, well in excess of his 95-percent goal,
while Plaintiff's overall average was 87.14 percent.  (*See id.*)  Thus, for the several
months leading up to Plaintiff's PIP, it cannot be said that Mr. Bennett escaped
this fate despite inferior job performance.

The record of Carrie Visser's sales performance is quite similar.  Ms.
Visser, like Plaintiff, failed to meet her 95-percent goal in seven of twelve months
in FY 2013, and her overall average of 94.86 percent for FY 2013 was slightly
lower than Plaintiff's 95.94 average.  (*See* Plaintiff's Response, Ex. 11, FY 2013
Sales Results; Ex. 17, Sales Goal Averages for FY 2013.)  Once again, however,
the figures for FY 2014 cast Ms. Visser's sales performance in a more favorable
light.  She, like Mr. Bennett, fell below her 95-percent goal in three of the first

eight months of FY 2014, while Plaintiff failed to meet this goal in seven of these eight months. (*See* Plaintiff's Response, Ex. 11, FY 2014 Sales Results; Ex. 17, Sales Goal Averages for FY 2014.) In addition, her overall average of 100.56 percent far exceeded Plaintiff's average of 87.14 percent for this same period. (*See id.*) Ms. Visser's sales record, then, does not assist Plaintiff in demonstrating that she was treated less favorably despite comparable job performance.

Turning, finally, to the sales performance of Jeffrey Kloosterman, he was not hired until March of 2013, midway through FY 2013, and his sales record for the remainder of this fiscal year was fairly comparable to Plaintiff's — falling short of his 95-percent goal in four of the remaining seven months (versus five for Plaintiff), and averaging 93.71 percent over this seven-month period (versus 95.94 percent for Plaintiff over the entire twelve-month fiscal year). (*See* Plaintiff's Response, Ex. 11, FY 2013 Sales Results; Ex. 17, Sales Goal Averages for FY 2013.) Mr. Kloosterman's sales record in FY 2014, however, tends to support Plaintiff's claim of disparate treatment, where he (like Plaintiff) failed to meet his 95-percent goal in seven of the first eight months of this fiscal year, and where his average of 82.66 percent over this eight-month period was below Plaintiff's average of 87.14 percent for the same period. (*See* Plaintiff's Response, Ex. 11, FY 2014 Sales Results; Ex. 17, Sales Goal Averages for FY 2014.)

28

This arguably favorable comparison to Mr. Kloosterman, however, does not withstand closer scrutiny.  First, when Plaintiff was placed on a PIP in May of 2014, she had been employed by Defendant for over five and a half years, while Mr. Kloosterman was a relatively new employee who had been with the company for just over a year.  Next, while Plaintiff's comparison to her fellow OSRs rests entirely on sales performance, Plaintiff's PIP also cited her failure to meet her employer's expectations regarding the "frequency and quality of [her] communication" with her supervisor, Mr. Walsh.  (PIP at 1.)  There is no evidence of similar deficiencies in Mr. Kloosterman's communications with Mr. Walsh; to the contrary, Mr. Walsh has stated that Mr. Kloosterman "continuously communicated with me to show he was engaged and working to regain and improve his market share."  (Walsh 4/1/2016 Decl. at ¶ 32.)  Finally, while Plaintiff asserts that Mr. Kloosterman "was never disciplined formally or informally for his consistently  poor sales performance," (Plaintiff's Response Br. at 6), the testimony cited in support of this contention addresses only PIPs, and not other forms of discipline, and the record is silent as to whether Mr. Kloosterman was counseled or disciplined in some manner as a result of shortfalls in his sales

performance.[12]

In summary, the record fails to support Plaintiff's contention that she alone was placed on a PIP, despite the allegedly inferior job performance of other OSRs in her region.  Because Plaintiff has not identified a basis in the record for concluding that Defendant's explanations for placing her on a PIP and subsequently terminating her employment are a pretext for discrimination on the basis of her alleged disability, she cannot meet her burden under the third and final stage of the *McDonnell Douglas* standard for proving unlawful discrimination through indirect evidence.

**C.   Plaintiff Has Failed to Establish a *Prima Facie* Case of Retaliation Under the ADA, Nor Has She Shown that Defendant's Stated Reason for Her Discharge Is a Pretext for Unlawful Retaliation.**

In Count II of her complaint, Plaintiff asserts that Defendant retaliated against her for engaging in activity that is protected under the ADA.  More specifically, Plaintiff alleges that Defendant singled her out for retaliation — by, among other things, placing her on a PIP and then discharging her — after she requested (and was granted) permission not to attend a February 2014 national

---

[12]In fact, Mr. Kloosterman testified that he began his first year of employment with Defendant on a "subsidy" that guaranteed him a minimum dollar amount in commissions, but that this subsidy was taken away "because my numbers had fallen, and it was a way to force me to become much more aggressive in my accounts."  (Defendant's Motion, Ex. 23, Kloosterman Dep. at 31.)

sales meeting due to health concerns that her physician was evaluating and treating.  The Court need not address this claim at great length, because it is defeated on many of the grounds already discussed with respect to Plaintiff's claim of disability discrimination.

The ADA prohibits "discriminat[ion] against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  In the absence of direct evidence of retaliation — and Plaintiff cites no such direct evidence here — an ADA claim of retaliation is evaluated under the same tripartite *McDonnell Douglas* standard that governs claims of disability discrimination.  *See Bryson v. Regis Corp.,* 498 F.3d 561, 577 (6th Cir. 2007).  At the first stage of this inquiry, Plaintiff must establish the three elements of a *prima facie* case:  (i) that she engaged in protected activity, (ii) that she suffered an adverse employment action, and (iii) that there is a causal link between her protected activity and the adverse employment decision.  *See Bryson,* 498 F.3d at 577.

Although Defendant principally challenges Plaintiff's showing as to the third of these elements, it questions as a threshold matter whether Plaintiff

31

engaged in any activity protected under the ADA.  (*See* Defendant's Motion, Br. in Support at 16 n.6.)  In support of this contention, Defendant observes that while Plaintiff requested an accommodation — namely, that she be excused from traveling to a national sales meeting — this request was expressly based on "symptoms" that she was experiencing at the time, (*see* Defendant's Motion, Ex. 3, Plaintiff's 1/29/2014 E-mail), and not a disability within the meaning of the ADA.  It follows, in Defendant's view, that a request for an accommodation that does not arise from an ADA disability should not count as protected activity under the ADA.[13]

While there is an undeniable logic to this argument, it is foreclosed by binding Sixth Circuit law.  In *Bryson,* the court explained that "[a] plaintiff may prevail on a disability-retaliation claim even if the underlying claim of disability

---

[13]More generally, one court has questioned whether an ADA retaliation claim that is based on a request for an accommodation "can be squared with the text of the statute." *Kirkeberg v. Canadian Pacific Railway,* 619 F.3d 898, 907 (8th Cir. 2010).  The ADA's anti-retaliation provision, after all, protects only those individuals who "opposed any act or practice made unlawful by this chapter" or who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter," 42 U.S.C. § 12203(a), and the court in *Kirkeberg* observed that an employee who requests a reasonable accommodation of her disability has not engaged in any of these specified activities, *see Kirkeberg,* 619 F.3d at 907.  Nonetheless, the court recognized that under binding Eighth Circuit precedent, a good faith request for a reasonable accommodation qualifies as protected activity, *see Kirkeberg,* 619 F.3d at 907-08 (citing *Heisler v. Metropolitan Council*, 339 F.3d 622, 632 (8th Cir. 2003)), and this Court likewise is bound by the Sixth Circuit's holding to the same effect in *Bryson,* 498 F.3d at 577.

fails." 498 F.3d at 577 (internal quotation marks and citations omitted).  In

support of this conclusion, the court pointed to cases from other circuits

recognizing that a request for an accommodation suffices to trigger protection

under the ADA's anti-retaliation provision, even if the requesting plaintiff cannot

show that she is disabled within the meaning of the ADA.  498 F.3d at 577 (citing

the Eighth Circuit's decision in *Heisler*, as well as cases from other circuits).

While the Sixth Circuit subsequently declined to extend *Bryson* to a case in which

the plaintiff neither "requested an accommodation" nor "filed a formal charge

while employed," but instead merely "discuss[ed] his sleep issues with his

employer," *Neely*, 640 F. App'x at 437, the present case plainly is governed by

*Bryson* rather than *Neely*, in light of Plaintiff's request for an accommodation.

Turning, then, to the third element of Plaintiff's *prima facie* case, she must

establish a causal connection between her request for an accommodation and an

adverse employment decision.  In her response to Defendant's motion, Plaintiff

once again fails to marshal much of an argument on this point, simply declaring

(without citation to the record or reference to any pertinent authority) that Mr.

Walsh "singled [her] out for retaliation" after she missed the February 2014

national sales meeting by "ignor[ing] her and refus[ing] to work with her,"

breaking a purported promise to ride along with Plaintiff in March, placing her "on

33

an unjustified PIP," and selecting her for discharge "because she was the only OSR that he had placed on a PIP." (Plaintiff's Response Br. at 20.) Apart from noting the bare fact that Mr. Walsh took these various actions after Plaintiff had requested an accommodation, Plaintiff does not suggest a basis for forging a causal connection between the former and latter occurrences.[14] The Sixth Circuit has emphasized, however, that temporal proximity alone is ordinarily insufficient to establish the causal connection prong of a *prima facie* case of retaliation, unless "an adverse employment action occurs very close in time after an employer learns of a protected activity." *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008). In this case, nearly three months passed between Plaintiff's request for an accommodation and Mr. Walsh's decision to place her on a PIP, and then another month went by before Plaintiff was discharged, so this lack of close temporal proximity precludes reliance on this consideration alone to establish the requisite causal connection.

Although Plaintiff fails to expressly identify any other evidence that might,

---

[14]Neither does Plaintiff even attempt to explain why each of the actions allegedly taken by Mr. Walsh should qualify as "adverse" under the second prong of her *prima facie* case. It seems doubtful, for example, that Mr. Walsh's failure to ride along with Plaintiff at some point during the month of March would constitute an adverse employment action. Moreover, Defendant notes that Plaintiff has failed to identify any evidentiary support for her claims that Mr. Walsh ignored her, refused to work with her, and skipped a scheduled ride-along in March, and it contends that the record refutes each of these assertions. (*See* Defendant's Reply Br. at 4-5 n.4.)

in her view, forge a causal connection between her protected activity and an adverse employment decision, she presumably believes that this showing may properly rest on the grounds (i) that she was placed on an "unjustified" PIP despite job performance comparable to or better than that of her OSR peers, (*see* Plaintiff's Response Br. at 20), and (ii) that this PIP was then relied upon by Mr. Walsh as a means to single out Plaintiff for discharge in Defendant's forthcoming workforce reduction. The Court has already addressed each of these arguments in the context of Plaintiff's claim of disability discrimination, and that analysis is fully applicable here. It follows that Plaintiff cannot establish the third element of her *prima facie* case of retaliation.

Even assuming that Plaintiff could establish a *prima facie* case, the remaining analysis of her retaliation claim would proceed along precisely the same lines as the Court's earlier assessment of Plaintiff's claim of disability discrimination. In particular, just as Plaintiff has failed to show that Defendant's stated non-discriminatory grounds for placing Plaintiff on a PIP and terminating her employment were a pretext for unlawful discrimination, it follows for the same reasons that she cannot show that the explanations given by Defendant for these actions were a pretext for unlawful retaliation. Accordingly, Defendant is entitled to an award of summary judgment in its favor on Plaintiff's ADA claim of

35

retaliation.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's April 4, 2016 motion for

summary judgment (docket #39) is GRANTED.


<u>s/Gerald E. Rosen</u>
United States District Judge

Dated:  January 24, 2017

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 24, 2017, by electronic and/or ordinary mail.

<u>s/Julie Owens</u>
Case Manager, (313) 234-5135

36